**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| RUTH DAVIS and JIM OGLETREE, individually and on behalf of a class of all others similarly situated,<br><br>    *Plaintiff*,<br><br>  v.<br><br>UNITED BANK CORPORATION RETIREMENT PLAN COMMITTEE, JENNIFER W. EAVENSON, JAMES J. EDWARDS, JR., J. JOSEPH EDWARDS, SR., ALLIE E. ARMISTEAD, CHRISTOPHER C. EDWARDS, JOHN W EDWARDS, JR., LAURIE E. FISHER, C. THOMAS HOPKINS, JR., STEVE C. KEADLE, DOUGLAS J. TUTTLE, AND FORREST A. WATSON, JR., UNITED BANK CORPORATION, UNITED BANK, JOHN DOES 1-10, and JANE ROES 1-10.<br><br>    *Defendant*,<br><br>  and<br><br>THE UNITED BANK EMPLOYEE STOCK OWNERSHIP PLAN,<br><br>    *Nominal Defendant* | Case No. _____<br><br>**CLASS ACTION COMPLAINT** |

Plaintiffs Ruth Davis and Jim Ogletree, by and through their attorneys, allege as follows:

**NATURE OF THE CASE**

1.  This action is brought pursuant to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001, *et seq.*, by Plaintiffs on behalf of a class of certain participants in and beneficiaries of the United Bank Corporation Employee Stock

1

Ownership Plan (the "ESOP" or "Plan") to remedy violations of ERISA arising out of the forced liquidation of Plaintiffs' company stock in the Plan and the sale of their stock in the Plan for less than fair market value.

2.      Plaintiffs are former, long-serving employees of United Bank Corporation ("UBC" or the "Company") who had significant investments in UBC stock through their ESOP accounts. Under the terms of the Plan in effect when they terminated employment with UBC, Plaintiffs were entitled to continue to hold Company stock in their ESOP accounts until age 65.

3.      But effective September 23, 2021—long after both Plaintiffs had terminated employment with UBC—the ESOP's Plan Administrator, the United Bank Corporation Retirement Plan Committee (the "Committee"), adopted a payment policy that purported to eliminate the right of former employees to continue to hold Company stock until age 65 (the "Payment Policy"). In October 2021, UBC involuntarily converted the Company stock of all former employees who participated in the Plan to cash. This eliminated the rights of Plaintiffs and the Class not only to continue to hold Company stock in their Plan account, but also to take a distribution in the form of stock rather than cash. And because it presented Plaintiffs with the false choice of either taking a cash distribution or leaving their money in a single default investment (with a substantially different risk and return profile than UBC stock), the cash distributions they took were non-consensual under ERISA.

4.      The Plan lacked the funds to liquidate all the shares affected by the payment policy. So the Committee turned to two other sources of funds: UBC itself and cash allocated to the accounts of current employees of the Company. Both UBC and its current employees are "parties-in-interest" under ERISA, and transactions between them and the Plan are prohibited unless Defendants can show an exemption is met.

5.      In 2022, shortly after Plaintiffs and the Class were forced out of the Plan, the Plan recognized a dividend of $23,307,638 on its Company stock. The forced liquidation of Plaintiffs' Company stock prevented them from sharing in this substantial dividend and from sharing in the future appreciation of UBC stock.

6.      The adoption and implementation of the Payment Policy was contrary to the terms of the Plan then in effect. In December 2021, UBC adopted a purported retroactive amendment to the Plan. This amendment not only purported to retroactively authorize the adoption of the Payment Policy, but also significantly curtailed the rights of participants to challenge fiduciary breaches. This amendment also attempted to impose a binding arbitration provision and limit the plan-wide remedies available to participants under ERISA, which numerous Circuits have held to be invalid. The Committee has attempted to retroactively apply these provisions to Plaintiffs to prevent them from effectively vindicating their rights under ERISA, and has misrepresented these provisions in the statutorily required disclosures it has made available to participants.

7.      Plaintiffs seek Plan-wide remedies and relief, on behalf of the Class, seek to require Defendants to reinstate them in the Plan, make good any losses resulting from their breaches of fiduciary duty and prohibited transactions, to restore to the Plan any profits made by the breaching fiduciaries through use of Plan assets, and to obtain other appropriate equitable relief to redress violations and enforce the provisions of the Plan and Title I of ERISA.

## JURISDICTION & VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States and pursuant to 29 U.S.C. § 1132(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA.

9.      This Court has personal jurisdiction over Defendants because ERISA provides for nationwide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

10.     Venue is proper in this District and this Division pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because: (a) as to Plaintiff Davis, the breaches and violations giving rise to her claims occurred in this District, and (b) at least one Defendant may be found in this District, including Defendant United Bank Corporation (which maintains offices in Upson County, Monroe County, and Lamar County), Defendant James J. Edwards, Jr. (who resides in Monroe County), Defendant J. Joseph Edwards, Sr. (who resides in Lamar County), Defendant Steve C. Keadle (who resides in Upson County), and Defendant Douglas J. Tuttle (who resides in Lamar County).

## PARTIES

**Plaintiffs**

11.     Plaintiff Ruth Davis is a former employee of UBC. Ms. Davis was employed by UBC from November 6, 1978, to approximately September 2001, and from June 24, 2002, to January 30, 2015. When she left employment with UBC, she was not yet 65 years old. Ms. Davis was a vested participant in the Plan. Ms. Davis remains a participant of the ESOP within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), because she has a colorable claim for additional benefits as a result of Defendants' breaches and violations. Ms. Davis was born in 1957. Ms. Davis resides in Milner, Georgia.

12.     Plaintiff Jim Ogletree is a former employee of UBC. Mr. Ogletree was employed by UBC from October 15, 1991 to April 15, 2016. When he left employment with UBC, he was not yet 65 years old, and he was a vested participant in the Plan. Mr. Ogletree is a participant of the ESOP within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), because he has a colorable

claim for additional benefits as a result of Defendants' fiduciary breaches and violations. Mr. Ogletree was born in 1960. Mr. Ogletree resides in Griffin, Georgia.

**Defendants**

      **The Committee Defendants**

13.     Defendant United Bank Corporation Retirement Plan Committee is a Georgia unincorporated association. Based on the Summary Plan Description of the ESOP dated September 23, 2021 (the "2021 SPD"), the Committee is the Plan Administrator of the ESOP. The Committee meets the definition of a person under ERISA § 3(9), 29 U.S.C. § 1002(9), because ERISA defines the term person broadly and because a committee meets the definition of an association or an unincorporated organization. The Committee and its members are fiduciaries of the Plan under ERISA § 3(21), 29 U.S.C. § 1002(21), because the Committee and its members have discretionary authority or discretionary responsibility for the administration of the Plan and because the Committee is a named fiduciary under Section 1.36 of the written instrument of the Plan adopted December 15, 2021 (the "December 2021 Plan Document").

14.     Defendant Jennifer W. Eavenson is the Director of Human Resources at United Bank Corporation and the Chairperson of the Committee. Because the Committee is the Plan Administrator, Defendant Eavenson exercises discretion and control with respect to the administration and management of the Plan and its assets and is a fiduciary of the ESOP within the meaning of ERISA § 3(21), 29 U.S.C § 1002(21). Defendant Eavenson resides in Covington, Georgia.

15.     Defendants John Does 1-10 (together with the Committee and Defendant Eavenson, the "Committee Defendants") are unknown members of the Committee between September 23, 2021, and the present. Because the Committee is the Plan Administrator, Defendants John Does 1-10 have discretionary authority or discretionary responsibility for the

administration of the Plan and are fiduciaries of the ESOP within the meaning of ERISA § 3(21), 29 U.S.C § 1002(21).

16.     The "Committee Defendants" refer to the Committee, Defendant Evanson and the unknown Committee Defendants (i.e. John Does 1-10)

**The Board Defendants**

17.     Defendant James J. Edwards, Jr. is the Chairman of the Board of Directors of UBC. Under Section 13.1 of the December 2021 Plan Document, UBC has the authority to appoint and remove the Trustee of the ESOP, and under Section 1.36 the Board of Directors is a named fiduciary of the Plan. The members of the Board Defendants are thus fiduciaries of the ESOP within the meaning of ERISA § 3(21), 29 U.S.C § 1002(21). Mr. Edwards resides in Forsyth, Georgia.

18.     J. Joseph Edwards, Sr. is a member of the Board of Directors of UBC. Under Section 13.1 of the December 2021 Plan Document, UBC has the authority to appoint and remove the Trustee of the ESOP, and under Section 1.36 the Board of Directors is a named fiduciary of the Plan. The members of the Board Defendants are thus fiduciaries of the ESOP within the meaning of ERISA § 3(21), 29 U.S.C § 1002(21). Mr. Edwards resides in Barnesville, Georgia.

19.     Allie E. Armistead is a member of the Board of Directors of UBC. Under Section 13.1 of the December 2021 Plan Document, UBC has the authority to appoint and remove the Trustee of the ESOP, and under Section 1.36 the Board of Directors is a named fiduciary of the Plan. The members of the Board Defendants are thus fiduciaries of the ESOP within the meaning of ERISA § 3(21), 29 U.S.C § 1002(21). Ms. Armistead resides in Zebulon Georgia.

20.    Christopher C. Edwards is a member of the Board of Directors of UBC. Under Section 13.1 of the December 2021 Plan Document, UBC has the authority to appoint and remove the Trustee of the ESOP, and under Section 1.36 the Board of Directors is a named fiduciary of the Plan. The members of the Board Defendants are thus fiduciaries of the ESOP within the meaning of ERISA § 3(21), 29 U.S.C § 1002(21). Mr. Edwards resides in Griffin, Georgia.

21.    John W. Edwards, Jr. is a member of the Board of Directors of UBC. Under Section 13.1 of the December 2021 Plan Document, UBC has the authority to appoint and remove the Trustee of the ESOP, and under Section 1.36 the Board of Directors is a named fiduciary of the Plan. The members of the Board Defendants are thus fiduciaries of the ESOP within the meaning of ERISA § 3(21), 29 U.S.C § 1002(21). Mr. Edwards resides in Zebulon, Georgia.

22.    Laurie E. Fisher is a member of the Board of Directors of UBC. Under Section 13.1 of the December 2021 Plan Document, UBC has the authority to appoint and remove the Trustee of the ESOP, and under Section 1.36 the Board of Directors is a named fiduciary of the Plan. The members of the Board Defendants are thus fiduciaries of the ESOP within the meaning of ERISA § 3(21), 29 U.S.C § 1002(21). Ms. Fisher resides in Sewanee, Tennessee.

23.    C. Thomas Hopkins, Jr. is a member of the Board of Directors of UBC. Under Section 13.1 of the December 2021 Plan Document, UBC has the authority to appoint and remove the Trustee of the ESOP, and under Section 1.36 the Board of Directors is a named fiduciary of the Plan. The members of the Board Defendants are thus fiduciaries of the ESOP within the meaning of ERISA § 3(21), 29 U.S.C § 1002(21). Dr. Hopkins resides in Griffin, Georgia.

24.    Steve C. Keadle is a member of the Board of Directors of UBC. Under Section 13.1 of the December 2021 Plan Document, UBC has the authority to appoint and remove the Trustee of the ESOP, and under Section 1.36 the Board of Directors is a named fiduciary of the Plan. The members of the Board Defendants are thus fiduciaries of the ESOP within the meaning of ERISA § 3(21), 29 U.S.C § 1002(21). Mr. Keadle resides in Thomaston, Georgia.

25.    Douglas J. Tuttle is a member of the Board of Directors of UBC. Under Section 13.1 of the December 2021 Plan Document, UBC has the authority to appoint and remove the Trustee of the ESOP, and under Section 1.36 the Board of Directors is a named fiduciary of the Plan. The members of the Board Defendants are thus fiduciaries of the ESOP within the meaning of ERISA § 3(21), 29 U.S.C § 1002(21). Mr. Tuttle resides in Barnesville, Georgia.

26.    Forrest A. Watson, Jr. is a member of the Board of Directors of UBC. Under Section 13.1 of the December 2021 Plan Document, UBC has the authority to appoint and remove the Trustee of the ESOP, and under Section 1.36 the Board of Directors is a named fiduciary of the Plan. The members of the Board Defendants are thus fiduciaries of the ESOP within the meaning of ERISA § 3(21), 29 U.S.C § 1002(21). Mr. Watson resides in Zebulon, Georgia.

27.    Defendants Jane Roes 1-10 are any unknown members of the board of directors of UBC between September 23, 2021, and the present. Under Section 13.1 of the December 2021 Plan Document, UBC has the authority to appoint and remove the Trustee of the ESOP, and under Section 1.36 the Board of Directors is a named fiduciary of the Plan. The Board Defendants thus have discretionary authority or discretionary responsibility for the administration of the Plan and are fiduciaries of the ESOP within the meaning of ERISA § 3(21), 29 U.S.C § 1002(21).

28.     The Board Defendants mean Defendants James J. Edwards, Jr., J. Joseph Edwards, Sr., Allie E. Armistead, Christopher C. Edwards, John W Edwards, Jr., Laurie E. Fisher, C. Thomas Hopkins, Jr., Steve C. Keadle, Douglas J. Tuttle, and Forrest A. Watson, Jr and any unknown members of the Board of Directors identified as Jane Roes 1-10.

**The Corporate Defendants**

29.     Defendant United Bank Corporation ("UBC") is a corporation organized under the laws of Georgia. Based on the recitals to and Section 1.42 of the December 2021 Plan Document, UBC is the Plan Sponsor of the ESOP. Because employees of UBC are participants in the ESOP, UBC is a party in interest with respect to the Plan within the meaning of ERISA § 3(14), 29 U.S.C § 1002(14). Under Section 13.2 of the December 2021 Plan Document, UBC has the authority to appoint and remove the Plan Administrator. UBC is thus also a fiduciary of the ESOP within the meaning of ERISA § 3(21), 29 U.S.C § 1002(21).

30.     Defendant United Bank (which is different than UBC and is referred to here as "United Bank") is a corporation organized under the laws of Georgia. Based on the 2021 SPD, United Bank is the Trustee of the ESOP. The Trustee is a fiduciary of the ESOP under ERISA § 3(21), 29 U.S.C. § 1002(21), because it has discretionary authority or discretionary responsibility for the administration of the Plan and because the Trustee is a named fiduciary under Section 1.36 of the December 2021 Plan Document.

**Nominal Defendant**

31.     The United Bank Employee Stock Ownership Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A). The written instrument by which the Plan is maintained within the meaning of ERISA § 402, 29 U.S.C. § 1102, (colloquially referred to as the "Plan Document") is the December 2021 Plan Document. According to the December 2021 Plan Document, UBC previously adopted the United Bank

Corporation Profit Sharing Stock Plan, which was later renamed the United Bank Corporation

Frozen Retirement Plan. Effective as of January 1, 2018, that prior plan was frozen and UBC

spun off the employee stock ownership plan portion into the Plan. The December 2021 Plan

Document states that "the Plan is intended to be an employee stock ownership plan within the

meaning of Section 4975(e)(7) of the Code." The ESOP is named as a nominal defendant

pursuant to Federal Rule of Civil Procedure 19 to ensure that complete relief can be granted as to

claims brought on behalf of the ESOP.

## CLASS ALLEGATIONS

32.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure on behalf of the following Class:

> Participants in the United Bank Corporation Employee Stock Ownership Plan who
> terminated employment with UBC prior to September 23, 2021, who had not
> reached age 65 when the UBC stock in their Plan account was liquidated, and the
> beneficiaries of such participants.

Excluded from the Class are Defendants and their immediate families, any other fiduciaries of

the Plan and their immediate families; the officers and directors of United Bank Corporation and

United Bank and their immediate families, and legal representatives, successors, and assigns of

any such excluded persons.

**Impracticality of Joinder**

33.     The members of the Class are so numerous that joinder of all members is

impracticable. According to the ESOP's Form 5500 Annual Report for the 2021 plan year, the

ESOP had 470 participants as of January 1, 2021, and 418 participants as of December 31, 2022.

And the ESOP's 2020 Form 5500 Annual Report (i.e. for the year ending December 31, 2020)

reported 81 participants who were former employees (26 receiving benefits and 55 entitled to

future benefits). Based on the number of former employee participants reported on the 2020

Form 5500 and the decrease of the number of participants between 2021 and 2022 (i.e. 55 participants), most if not all of them are members of the Class. Additionally, most, if not all, of the ESOP participants likely had at least one beneficiary because every married participant had at least one beneficiary (i.e. a spouse) and some participants likely designated more than one beneficiary. As such, the class likely consists of at least 100 persons.

**Commonality**

34.     The issues of liability are common to all members of the Class and are capable of common answers as those issues primarily focus on Defendants' acts. The common issues include whether Defendants breached fiduciary duties to participants, whether Defendants engaged in prohibited transactions, whether the Payment Policy was adopted in contravention of the terms of the Plan applicable to terminated employees, whether the retroactive amendment of the Plan in December 2021 was effective as to terminated employees, whether the binding arbitration provisions of the December 2021 Plan Document are unenforceable under ERISA, and the appropriate relief for Defendants' violations of ERISA.

**Typicality**

35.     Plaintiffs' claims are typical of the claims of other members of the Class because their claims arise from the same event, practice and/or course of conduct. Specifically, Plaintiffs, on behalf of the Class, allege that Defendants engaged in prohibited transactions and/or breaches of fiduciary duty in connection with the adoption of the Payment Policy, the involuntary liquidation of their UBC stock, the attempted retroactive application of the terms of the December 2021 Plan Document to terminated employees, and the attempted application of an unlawful binding arbitration provision against participants.

**Adequacy**

36.     Plaintiffs will fairly and adequately represent and protect the interests of the Class.

37.     Plaintiffs do not have any interests antagonistic to or in conflict with those of the Class.

38.     Defendants have no unique defenses against Plaintiffs that would interfere with Plaintiffs' representation of the Class.

39.     Plaintiffs are represented by counsel with extensive experience prosecuting ERISA class actions (with particular experience and expertise in ESOP litigation) and class actions generally.

**Rule 23(b)(1)**

40.     The requirements of Fed. R. Civ. P. 23(b)(1)(A) are satisfied. Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to act in the best interests of the Plan and its participants. As a result, prosecution of separate actions by individual members would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct relating to the Plan.

41.     The requirements of Fed. R. Civ. P. 23(b)(1)(B) are also satisfied. Administration of an ERISA-covered plan requires that all similarly situated participants be treated the same. Resolving whether Defendants engaged in prohibited transactions with respect to the Plan and fulfilled their fiduciary obligations to the Plan would, as a practical matter, be dispositive of the interests of the other participants in the ESOP even if they are not parties to this litigation and would substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the Class.

12

**Rule 23(b)(2)**

42.    The requirements of Fed. R. Civ. P. 23(b)(2) are satisfied as to the Class because Defendants have acted and/or failed to act on grounds generally applicable to the Class, making declaratory and injunctive appropriate with respect to the Class as a whole. This action challenges whether Defendants engaged in prohibited transactions, which would be violations of ERISA as to the ESOP as a whole and as to the Class as a whole. The relief sought in this case primarily consists of declarations that Defendants engaged in prohibited transactions or breached their fiduciary duties. As ERISA is based on trust law, any monetary relief consists of equitable monetary relief that would either flow directly by the declaratory or injunctive relief or flows as a necessary consequence of that relief.

**Rule 23(b)(3)**

43.    The requirements of Fed. R. Civ. P. 23(b)(3) are also satisfied.  The common questions of law and fact concern whether Defendants engaged in prohibited transactions or breached their fiduciary duties to the ESOP. As the members of the Class were participants in that Plan, their accounts were affected by those breaches and violations. Common questions related to liability will necessarily predominate over any individual questions precisely because Defendants' duties and obligations were uniform to all participants and therefore all members of the Class. As relief and any recovery will be on behalf of the Plan, common questions as to remedies will likewise predominate over any individual issues.

44.    A class action is a superior method to other available methods for the fair and efficient adjudication of this action.  As the claims generally are brought on behalf of the Plan, resolution of the issues in this litigation will be efficiently resolved in a single proceeding rather than multiple proceedings and each of those individual proceedings could seek recovery for the entire Plan.  Class certification is a superior method of proceeding because it will obviate the

need for unduly duplicative litigation which might result inconsistent judgments about Defendants' duties with regard to the ESOP.

45.     The following factors set forth in Rule 23(b)(3) also support certification:

a.     The members of the Class have an interest in a unitary adjudication of the issues presented in this action for the reasons that this case should be certified under Rule 23(b)(1).

b.     No other litigation concerning this controversy has been filed by any other members of the Class.

c.     This District is a desirable location for concentrating this litigation because (i) UBC maintains offices in this District; (ii) a significant number of Class members are located in this District, and (iii) a number of the witnesses, including a number of relevant non-party witnesses, are expected to be located in this District.

d.     There are no anticipated difficulties in managing this case as a class action.

## FACTUAL ALLEGATIONS

**Background of United Bank Corporation and the Plan**

46.     United Bank Corporation is a Georgia corporation, formed in 1905. According to its website, it was founded by "a group of local businessmen" in Zebulon, Georgia, with the vision "to create a trusted, convenient financial institution with deep roots in its small town community."

47.     According to United Bank Corporation's Consolidated Financial Statements as of December 31, 2023 and 2022 and Independent Auditor's Report, "For the years ended December 31, 2007 through December 31, 2021, the Company elected to be taxed as a Subchapter S

14

corporation…. On January 25, 2022, the Company's shareholders voted for the revocation of this Subchapter S election effective with the year beginning on January 1, 2022."

48.    According to its website, UBC operates approximately 19 branch offices, all in Georgia.

49.    According to a document entitled "Our Story 2024" available on the UBC website, UBC held approximately $2.3 billion in assets as of year-end 2023.

50.    According to documents entitled "Our Story 2024" and "Our Story 2023" available on the UBC website, UBC's board of directors in 2024 and 2023 has included: James J. Edwards, Jr., J. Joseph Edwards, Sr., Allie E. Armistead, Christopher C. Edwards, John W Edwards, Jr., Laurie E. Fisher, C. Thomas Hopkins, Jr., Steve C. Keadle, Douglas J. Tuttle, and Forrest A. Watson, Jr.

51.    According to the written instrument of the Plan dated April 19, 2011, predecessors in interest to UBC established the Profit Sharing Plan of Crawford County Bank and affiliates on November 10, 1970. UBC established the United Bank Corporation Employee Stock Ownership Plan on January 1, 1984, and the United Bank Corporation Section 401(f) Profit Sharing Plan on October 20, 1988. In 1989, the profit sharing plan and ESOP were merged, and in 1990 the 401(k) plan was merged with the other two plans. In 2005, the ESOP portion of the combined plan was terminated, and in 2006 a new employee stock ownership component was added to the combined plan: the United Bank Corporation Profit Sharing Stock Plan.

52.    Effective as of January 1, 2018, that prior, combined plan was frozen and UBC spun off the employee stock ownership plan portion of the Profit Sharing Stock Plan into the United Bank Corporation Employee Stock Ownership Plan.

**Relevant Provisions of the Written Instruments of the Plan and the Trust before the Adoption of the December 2021 Plan Document**

**The 2011 Plan Document**

53.    UBC amended and restated the written instrument of the United Bank Corporation Profit Sharing Stock Plan on April 19, 2011 (the "April 2011 Plan Document").

54.    The April 2011 Plan Document was the written instrument of the Plan, within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a), in effect as of the dates that Plaintiffs terminated their employment with UBC.

55.    Section 1.36 of the April 2011 Plan Document defined the Normal Retirement Age as "the later of the date the Participant attains age 65 or the fifth anniversary of the date on which he first becomes a Member" of the Plan.

56.    Section 9.4(a)(1) of the April 2011 Plan Document provided that "Notwithstanding any provision of the Plan to the contrary… if a Member's vested Accrued Benefit exceeds $5,000… it shall not, without the Member's consent, be distributed prior to the date the member attains his Normal retirement Age."

57.    Section 18.1 of the April 2011 Plan Document provided that "No amendment may retroactively change or deprive Members or Beneficiaries of rights already accrued under the Plan."

**The 2016 Plan Document**

58.    UBC amended and restated the written instrument of the United Bank Corporation Profit Sharing Stock Plan on November 8, 2016 (the "November 2016 Plan Document").

59.     Section 1.6 of the November 2016 Plan Document defined the Normal Retirement Age as "the later of the date the Participant attains age 65 or the fifth anniversary of the date on which he first becomes a Member" of the Plan.

60.     Section 9.4(a)(1) of the November 2016 Plan Document provided that "Notwithstanding any provision of the Plan to the contrary… if a Member's vested Accrued Benefit exceeds $5,000… it shall not, without the Member's consent, be distributed prior to the date the member attains his Normal retirement Age."

61.     Section 18.1 of the November 2016 Plan Document provided that "No amendment may retroactively change or deprive Members or Beneficiaries of rights already accrued under the Plan."

**The 2018 Plan Document**

62.     UBC adopted a written instrument for the United Bank Corporation Employee Stock Ownership Plan on November 15, 2017, effective as of January 1, 2018 (the "January 2018 Plan Document").

63.     The preamble to the January 2018 Plan Document provided that the Plan was "intended to be an employee stock ownership plan within the meaning of Section 4975(e)(7). Section 5.3 provided that the "Fund"—essentially, the assets of the Plan—"shall be invested primarily in Company Stock to the extent shares are available."

64.     Section 1.36 of the January 2018 Plan Document defined the Normal Retirement age as "the later of the date the Participant attains age 65 or the fifth anniversary of the date on which he first becomes a Participant."

65.    Section 9.1(d) of the January 2018 Plan Document provided that "no distribution of the vested Account balance of a participant will be made without his request before he reaches Normal Retirement Age."

66.    Section 9(f) of the January 2018 Plan Document provided that:

> payment of the Account of a participant shall be made in a lump sum in cash; provided, however… at any time during which the Primary Sponsor does not have an election in effect under Subchapter S of the Code, the Participant or Beneficiary will have the right to demand to receive payment of the Participant's Account in the form of Company Stock….

67.    Section 13.1 of the January 2018 Plan Document provides that the Trustee shall be "designated by the Board of Directors" of UBC.

68.    Section 13.2 of the January 2018 Plan Document provides that "The Primary Sponsor shall appoint a Plan Administrator" and "shall have the right to remove the Plan Administrator at any time by notice in writing."

69.    Section 13.7 of the January 2018 Plan Document provides that "Any action to be taken by a Plan Sponsor shall be taken by resolution or written direction duly adopted by its board of directors or appropriate governing body, as the case may be; provided, however, that by such resolution or written direction, the board of directors or appropriate governing body, as the case may be, may delegate to any officer or other appropriate person of a Plan Sponsor the authority to take any such actions as may be specified in such resolution or written direction, other than the power to amend, modify or terminate the Plan or the Trust or to determine the basis of any Plan Sponsor contributions."

70.    Section 18.1 of the January 2018 Plan Document provided that no "modifications or amendments [to the Plan or the Trust] shall have the effect of retroactively changing or depriving Participants or Beneficiaries of rights already accrued under the Plan."

18

**Material Similarly of the Terms of the Plan Through the 2018 Plan Document**

71.    Under the terms of the April 2011 Plan Document, the November 2016 Plan Document, and the January 2018 Plan Document, no distribution of the vested account balance of the Plaintiffs could be made without their request until they reached 65. In other words, the relevant terms of the Plan for purposes of the claims of Plaintiffs and the Class remained the materially the same through the January 2018 Plan Document.

72.    The January 2018 Plan Document was the written instrument in effect when the stock in the Plan accounts of Plaintiffs and the Class were liquidated.

**The Trust Agreement**

73.    United Bank Corporation and United Bank entered into a Trust Agreement effective January 1, 2018 (the "Trust Agreement"), by which United Bank serves as Trustee.

74.    Section 1 of the Trust Agreement provides that the "Trustee Agrees to hold the Trust Fund and trust," that the Trustee shall "receive and accept… all sums of money and other property acceptable to the Trustee for receipt which is paid to the Trust."

75.    Section 2.6 of the Trust Agreement provides that the Trustee has powers including: "To make distributions and payments from the Trust Fund to the Persons, in the manner, at the times as directed by the Plan Administrator," "to begin, maintain, or defend any litigation necessary in connection with the investment, reinvestment, and holding of the assets of the Trust Fund and the administration of the Trust," "to join in or oppose… liquidations," "To retain any assets, funds, or property subject to any dispute… or to decline to make payment or delivery of the funds or property, until final adjudication is made by a court of competent jurisdiction," and to "determine the fair market value of the Company Stock and other assets of the Trust Fund as of each Valuation Date."

76.    Section 2.8 of the Trust Agreement provides that "The Trustee shall not cause the Trust to engage in any transaction prohibited by either this Trust Agreement, ERISA or the Code."

**Plaintiff Davis's Employment and Plan Participation**

77.    Plaintiff Ruth Davis was employed by UBC from June 24, 2002, to January 31, 2015.

78.    At the time of her termination from UBC, Ms. Davis was a Vice President at UBC.

79.    Ms. Davis was a participant in the United Bank Corporation Profit Sharing Stock Plan. Over the course of her many years of service to UBC, she accumulated substantial holdings of UBC stock in the Plan.

80.    Ms. Davis continued to hold UBC stock her Plan account following her termination from employment with UBC.

81.    As of January 1, 2021, Ms. Davis held UBC stock through her Plan account that her participant statements reported as worth $1,666,343.86.

82.    Ms. Davis was born in 1957. Under the terms of the April 2011 Plan Document that applied to her at the time she terminated employment with UBC, no distribution of her Plan benefits could be made to her without her request until she reached the Normal Retirement Age of 65, in 2022.

**Plaintiff Ogletree's Employment and Plan Participation**

83.    Plaintiff Jim Ogletree was employed by UBC from October 15, 1991 to April 15, 2016.

84.    At the time of his termination from UC, Mr. Ogletree was the President of the Griffin, Georgia division of UBC.

85.    Mr. Ogletree was a participant in in the United Bank Corporation Profit Sharing Stock Plan. Over the course of his many years of service to UBC, he accumulated a substantial position in UBC stock through the Plan.

86.    Mr. Ogletree continued to hold UBC stock in his Plan account following his termination from employment with UBC.

87.    Mr. Ogletree was born in 1960. Under the terms of the April 2011 Plan Document that applied to him at the time of his termination, no distribution of his Plan benefits could be made to him without his request until he reached the Normal Retirement Age of 65 in 2025.

**UBC Adopts the Payment Policy**

88.    UBC sent a letter to ESOP participants dated September 23, 2021, which included an attached Statement of Material Modifications (the "SMM").

89.    The SMM stated that "This document modifies your Summary Plan Description for the Plan."

90.    The SMM further stated that "The Normal Retirement Age under the Plan is currently age 65. The Plan is amended to provide a new Normal Retirement Age as the month in which a Participant reaches age 60."

91.    The SMM further stated that UBC "has determined that it is in the best interests of Participants to implement a separate distribution policy to address the timing, form and content of distributions under the Plan and other features related to the content of Participants' account balances." The SMM explained this policy would be effective September 23, 2021, and that: "As provided in the ESOP Payment Policy, after you terminate employment with the Company and its affiliates, the Plan Administrator may… replace the value of any Company Stock allocated to your Account with cash equal to the value of such Company Stock, as

determined by the ESOP trustee in connection with the most recent valuation of such Company Stock on the date of the conversion."

92.     The SMM further stated that: "Following the conversion of Company Stock to cash, a Participant (or Beneficiary, as applicable) may elect to (1) request a distribution from the Plan and roll the amount distributed over to another employer's qualified plan that accepts rollover or an individual retirement account; (2) transfer the account balance to the United Bank Corporation 401(k) Plan or leave the account balance in the Plan to be invested in an investment fund selected by the Plan Administrator and managed by American Funds. The current fund in which converted account balance [sic] will be invested is called the American Balanced Fund (RLBGX) (the 'Fund'). The Fund is a balanced fund that invests in common stocks, preferred stocks, bonds, convertibles, and cash."

93.     The United Bank Corporation Employee Stock Ownership Plan Payment Policy (the "Payment Policy") is itself undated, and only states that it was adopted "effective as of September 23, 2021." No document provided to Plaintiffs to date identifies when the Payment Policy was actually adopted.

94.     Section 7 of the Payment Policy provides that "…the Company will convert shares of Company Stock held in the Company Stock subaccounts of terminated Participants who terminated employment during the current plan year or any prior Plan Year into cash based on the fair market value of the Company Stock as of the end of the most recently ended calendar quarter…."

95.     Section 7 of the Payment Policy further provides that: "Following the transfer of Company Stock from a… Participant's Company Stock Subaccount to the Participant's Other Investment Subaccount, (A) the Plan Administrator may invest the such Other Investment

Subaccount in a managed investment fund chosen by the Plan Administrator, or (B) the Participant may elect to receive a distribution of the vested portion of his or her vested Account balance."

96.     Section 9 of the Payment Policy provides that "this Payment Policy is not intended to contravene any provision of the Plan document and to the extent it does so, the terms of the Plan document will control."

**UBC Forcibly Liquidates Plaintiffs' UBC Stock For Less Than Fair Market Value**

97.     Based on the denials of Plaintiffs' administrative claims issued by the Committee, the shares of UBC stock held in Plaintiffs' Plan accounts were involuntarily converted to cash at a price of $196.00 per share in October 2021.

98.     Based on a tender offer for the purchase of UBC stock issued by United Bank Corporation and the United Bank Corporation Employee Stock Ownership Trust in 2024, quarterly valuations of UBC stock for plan administration purposes are performed by Sheshunoff & Co., an investment bank.

99.     The price of $196.00 per share did not reflect the true fair market value of UBC stock, including because UBC planned to revoke its Subchapter S election as of January 1, 2022, less than three months later, which would result in a significant dividend to owners of UBC stock. This planned conversion and dividend should have impacted the valuation of Plaintiffs' stock in two key ways.

100.     First, the imminent revocation of UBC's Subchapter S election and issuance of a substantial dividend would have impacted the discount for lack of marketability assessed on Plaintiff's UBC stock. Shannon Pratt's leading business valuation treatise, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* (6th Ed.) (hereafter, "Pratt") explains that "Ownership interests in closely held businesses—even substantial closely held businesses—

are illiquid relative to many other types of investments…. Therefore analysts have to identify and quantify the valuation adjustment associated with lack of liquidity and the lack of marketability of the subject business enterprise and in the subject business ownership interest." Pratt 420.

101.    Dividends impact the assessment of the appropriate discount for lack of marketability. "Stocks with no or low dividends suffer more from a lack of marketability than stocks with high dividends. Besides being empirically demonstrable, this makes common sense. If the stock pays no dividend, the holder is dependent *entirely* on some future ability to sell the stock to realize any return. The higher the dividend, the greater the return the holder realizes without regard for sale of stock." Pratt 447.

102.    The 2022 dividend that the Plan would realize from the revocation of its Subchapter S election was anomalous for UBC. In 2021, UBC recognized dividend income of $3,576,123. According to the Plan's Form 5500 Annual Report for 2022, the Plan recognized a dividend of $23,307,638 in 2022 on its UBC stock. In light of this large, imminent dividend, Sheshunoff & Co. should have adjusted its valuation to reduce the discount for lack of marketability it assessed on UBC for purposes of its valuations.

103.    Based on the Plan's Form 5500 for 2021, the value of the Plan's stock between December 31, 2020, and December 21, 2021, was essentially flat, and did not reflect an increase in value based on the large and anomalous dividend UBC expected.

104.    The Form 5500 for 2021 includes discussion of the valuation methodologies used to value the Plan's assets, but does not describe any adjustment to the discount for lack of marketability for UBC stock in light of the large and anomalous dividend UBC expected.

105.    In fact, the Form 5500 for 2021 states that "There have been no changes in the [valuation] methodologies used as of December 31, 2021 and 2020."

106.    Based on the lack of substantial change in the price of UBC stock between 2020 and 2021, the lack of any disclosure of an adjustment to the lack of marketability for UBC stock in the 2021 Form 5500, and the Form 5500's express statement that there were no methodological changes between 2020 and 2021, the price paid for the UBC stock of Plaintiff and the Class and the Sheshunoff & Co. valuation on which it was based did not adjust the discount for lack of marketability to account for the large and anomalous dividend that UBC stockholders would imminently realize.

107.    Following the involuntary conversion of their UBC stock to cash, Plaintiffs took distributions of their Plan accounts in the form of cash through rollovers to other retirement plan account. Based on the denials of Plaintiffs' administrative claims issued by the Committee, Plaintiffs' account balances were distributed to them on October 28, 2021.

**UBC Retroactively Amends the Plan Document**

108.    On December 15, 2021, UBC amended and restated the written instrument of the Plan (the "December 2021 Plan Document").

109.    The preamble to the December 2021 Plan Document stated it was "effective as of September 23, 2021." In other words, UBC amended the Plan retroactively.

110.    Section 1.37 of the December 2021 Plan Document defines "Normal Retirement Age" as "prior to the Amendment Date, the later of the date the Participant attains age sixty-five (65) or the fifth anniversary of the date on which he first becomes a Participant and, for any Participant who completes an Hour of Service on and after the Amendment Date, Normal Retirement Age means age sixty (60)."

111.    Section 9.6 of the December 2021 Plan Document provides that: "At any time following a Participant's Termination of Employment for any reason, the Plan Administrator may provide in the Payment Policy for the transfer of Company Stock held in the Participant's vested Account out of such Account in a uniform and nondiscriminatory manner."

112.    Section 9.6(a) of the December 2021 Plan Document provides that in making such a transfer, "the Trustee shall exchange the Company Stock held in the Company Stock Subaccount of a Participant who has experienced a Termination of Employment for cash from the Other Investment Subaccounts of all other Participants… in an amount equal to the Fair Market Value of Company Stock as of the most recent Valuation Date."

113.    Section 9.6(b) of the December 2021 Plan Document provides that: "Following the transfer of Company Stock from a terminated Participant's Company Stock Subaccount… the Plan Administrator may (1) invest the amount held in the Participant's Other Investment Subaccount among a managed fund selected by the Plan Administrator; (2) allow the Participant to choose to invest the Other Investment Subaccount among at least three (3) diversified investment fund, none of which invests in Company Stock to a substantial degree; or (3) transfer the portion of the Participant's vested account to another qualified plan of the Plan Sponsor which accepts such transfers, provided that such plan permits employee-directed investment among at least three (3) diversified investment funds."

114.    Section 13.1 of the December 2021 Plan Document provides that the Trustee shall be "designated by the Board of Directors" of UBC.

115.    Section 13.2 of the December 2021 Plan Document provides that "The Primary Sponsor shall appoint a Plan Administrator" and "shall have the right to remove the Plan Administrator at any time by notice in writing."

26

116.    Section 13.7 of the December 2021 Plan Document provides that "Any action to be taken by a Plan Sponsor shall be taken by resolution or written direction duly adopted by its board of directors or appropriate governing body, as the case may be; provided, however, that by such resolution or written direction, the board of directors or appropriate governing body, as the case may be, may delegate to any officer or other appropriate person of a Plan Sponsor the authority to take any such actions as may be specified in such resolution or written direction, other than the power to amend, modify or terminate the Plan or the Trust or to determine the basis of any Plan Sponsor contributions."

**UBC Retroactively Adopts an Invalid Arbitration Provision**

117.    Section 18.1 of the December 2021 Plan Document provides that no "modifications or amendments [to the Plan or the Trust] shall have the effect of retroactively changing or depriving Participants or Beneficiaries of rights already accrued under the Plan."

118.    Section 21.1(a) of the December 2021 Plan Document defines "Covered Claims" as: "Any claim made by or on behalf of an Employee (including a former Employee), Participant or Beneficiary (a 'Claimant') which arises out of, relates to, or concerns the Plan or the Trust, including without limitation, any claim for benefits under the Plan or the Trust; any claim asserting a breach of, or failure to follow, the Plan or Trust; and any claim asserting a breach of, or failure to follow, any provision of ERISA or the Code, including without limitation claims for breach of fiduciary duty, ERISA Section 510 claims, and claims for failure to timely provide notices or information required by ERISA or the Code…."

119.    Section 21.1(a) of the December 2021 Plan Document provides that all Covered Claims "shall be resolved exclusively by binding arbitration administered in accordance with the

National Rules for the Resolution of Employment Disputes (the 'Rules') of the American

Arbitration Association ('AAA') then in effect."

120. Section 21.1(b) of the December 2021 Plan Document purports to eliminate the

right of participants to seek plan-wide or class-wide relief, providing:

> All Covered Claims must be brought solely in the Claimant's individual capacity and not in a representative capacity or on a class, collective, or group basis. Each arbitration shall be limited solely to one Claimant's Covered Claims, and that Claimant may not seek or receive any remedy which has the purpose or effect of providing additional benefits or monetary or other relief to any person, including without limitation, any Eligible Employee, Participant or Beneficiary other than the Claimant. For instance, with respect to any claim brought under ERISA Section 502(a)(2) to seek appropriate relief under ERISA Section 409, the Claimant's remedy, if any, shall be limited to (1) the alleged losses to the Claimant's individual Account resulting from the alleged breach of fiduciary duty, (2) a pro-rated portion of any profits allegedly made by a fiduciary through the use of Plan assets where such pro-rated amount is intended to provide a remedy solely to Claimant's individual Account, and/or (3) such other remedial or equitable relief as the arbitrator(s) deems proper so long as such remedial or equitable relief does not include or result in the provision of additional benefits or monetary relief to any person, including without limitation, any Eligible Employee, Participant or Beneficiary other than the Claimant, and is not binding on the Plan Administrator or Trustee with respect to any Eligible Employee, Participant or Beneficiary other than the Claimant. The requirement that (x) all Covered Claims be brought solely in a Claimant's individual capacity and not in a purported group, class, collective, or representative capacity, and (y) that no Claimant shall be entitled to receive, and shall not be awarded, any relief other than individual relief, shall govern irrespective of any AAA rule or decision to the contrary and is a material and non-severable term of this Section 21. The arbitrator(s) shall consequently have no jurisdiction or authority to compel or permit any group, class, collective, or representative action in arbitration, to consolidate different arbitration proceedings, or to join any other party to any arbitration. Any dispute or issue as to the applicability or validity of this Subsection (b) (the 'Class Action Waiver') shall be determined solely by the court designated in Section 21.2. Moreover, nothing in this Arbitration Procedure shall preclude seeking interim or provisional relief or remedies in aid of arbitration from such court. In the event a court were to find these requirements to be unenforceable or invalid, then the entire Arbitration Procedure (i.e., all of this Section 21) shall be rendered null and void in all respects as to the particular claim that is the subject of the court's ruling.

121. Section 21(e) of the December 2021 Plan Document purports to limit the time

period within which participants may bring claims, providing:

Any Covered Claim must be submitted to arbitration within the earlier of the applicable statutory period of limitations or three (3) years following the date on which the Covered Claim accrued or it shall be barred as untimely; provided, however, any Covered Claim under ERISA Section 502(a)(l)(B) for a denial of benefits shall be deemed to have accrued on the date the Plan Administrator's final denial is issued under the Plan's claims procedure, and any demand for arbitration involving such a claim shall be served on the Plan Administrator and, if applicable, the Trustee, and filed with the AAA within twelve (12) months following the date on which the final denial of claim is issued by the Plan Administrator.

122.    Section 21(m) of the December 2021 Plan Document purports to limit the venue in which any challenge to the legal enforceability of this arbitration procedure may be brought, providing:

If a Claimant wishes to pursue any Covered Claim, that Claimant shall comply with the Arbitration Procedure, set forth in this Section 21 of the Plan, and shall not file any such claim in a state or federal court. To the extent, however, any Claimant fails or refuses to comply with the Arbitration Procedure, wishes to challenge the legal enforceability of the Arbitration Procedure, or to the extent the Arbitration Procedure is invalidated, such action or challenge shall be filed exclusively in the United States District Court for the Southern District of Georgia, which is where the Plan is administered. In the event a Claimant makes an unsuccessful challenge to the validity, enforceability or scope of the Arbitration Procedure in any court, the Claimant shall, to the maximum extent permitted by law, reimburse the defendants in that action for all attorneys' fees, costs, and expenses incurred by them in defending against the Claimant's unsuccessful court challenge.

**Subsequent Events**

123.    According to United Bank Corporation's Consolidated Financial Statements as of December 31, 2023 and 2022 and Independent Auditor's Report, on January 25, 2022, the Company's shareholders voted for the revocation of its Subchapter S election effective January 1, 2022.

124.    According to the Plan's Form 5500 Annual Report for 2022, the Plan recognized a dividend of $23,307,638 in 2022 on its UBC stock.

125.    According to United Bank Corporation's Consolidated Financial Statements as of December 31, 2023 and 2022 and Independent Auditor's Report On January 25, 2022, that

dividend was paid at $72.25 per share and was made "in connection with the Company's conversion from a corporation electing to be taxed as a S corporation to a C corporation."

**Plaintiffs' Exhaustion of Administrative Remedies**

126.    On February 22, 2024, Plaintiff Davis submitted an administrative claim to the Plan Administrator of the ESOP detailing the claims set forth herein. Plaintiff Davis's claim was denied by a letter dated May 17, 2024, but which was not received by Plaintiff Davis until June 15, 2024.  As a result of the delay in the receipt of that denial, Plaintiff Davis sought and the Plan Administrator agreed to provide an extension for her appeal until August 14, 2024.  Plaintiff Davis appealed that denial on August 12, 2024.  The Plan Administrator has not yet issued a decision on that appeal.

127.    On March 19, 2024, Plaintiff Ogletree submitted an administrative claim to the Plan Administrator of the ESOP detailing the claims set forth herein. Plaintiff Ogletree's claim was denied by a letter dated June 14, 2024. Plaintiff Ogletree appealed that denial on August 13, 2024.  The Plan Administrator has not yet issued a decision on that appeal.

**Plaintiffs' Request for the Documents Used to Determine the Price of UBC Stock**

128.    In connection with their administrative claims, both Plaintiffs requested the valuation report or other document that was used to determine the price at which their UBC stock was converted to cash. The Committee's denials dated May 17, 2024, and June 14, 2024 respectively, specifically refused to provide any such document by asserting such document did not fall within the scope of documents participants are entitled to under ERISA § 104(b).

**COUNT I**
**Engaging in Prohibited Transaction Forbidden by ERISA § 406(a),**
**29 U.S.C. § 1106(a), and ERISA § 406(b), 29 U.S.C. § 1106(b)**
**Against UBC and United Bank**
**on behalf of the Class**

129.    Plaintiffs incorporate and re-allege by reference each of the foregoing paragraphs as if fully set forth herein.

130.    ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), requires that a plan fiduciary "shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect (A) sale or exchange, or leasing of any property between the plan and a party in interest," or a "(D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan."

131.    ERISA § 406(b), 29 U.S.C. § 1106(b), mandates that a plan fiduciary shall not (1) "act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants," or (2) "deal with the assets of the plan in his own interest or for his own account," or (3) "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." *Id.*

132.    United Bank was the Trustee of the Plan in October 2018 and was a named fiduciary of the Plan.

133.    UBC had the authority to appoint the Plan Administrator of the Plan as of October 2018 and was thus a fiduciary of the Plan. In addition, Section 7 of the Payment Policy provided that "the Company"—Defendant United Bank Corporation—would effect the conversion of Company Stock held by terminated UBC employees. UBC acted as a fiduciary of the Plan by implementing the Payment Policy and effecting the conversion of Company Stock held by the

Plan because in doing so it exercised discretionary control and authority over the administration and management of the Plan and its assets

134.    ERISA § 3(14), 29 U.S.C. § 1002(14) defines a "party in interest" to include (A) any fiduciary of a plan, (C) an employer whose employees are covered by such plan and (E) an employee of an employer whose employees are covered by such plan. UBC and United Bank were fiduciaries of the Plan, and UBC was also an employer whose employees were covered by the Plan. Defendants UBC and United Bank each qualified as "party in interest" within the meaning of ERISA § 3(14)(A) and (C). Additionally, UBC's current employees who were participants in the Plan were also "parties-in-interest" within the meaning of ERISA § 3(14)(E).

135.    Section 7 of the Payment Policy provided that "the Company"—Defendant United Bank Corporation—would effect the conversion of Company Stock held by terminated UBC employees, and that to the extent cash was available in the Company Stock Subaccounts of active Participants such cash would be used to convert the shares. Based on statements in the formal written denials of Plaintiffs' administrative claims, UBC used both its own cash and cash in the accounts of active participants—current employees—to pay for the conversion of the UBC stock of Plaintiff and the Class to cash. The conversion of the UBC stock of Plaintiffs and the Class to cash was thus a direct or indirect exchange of property between the Plan and parties-in-interest prohibited by ERISA § 406(a)(1)(A) and use of assets of the Plan by Defendant UBC prohibited by ERISA § 406(a)(1)(D).

136.    Pursuant to the January 2018 Plan Document, the Trustee—Defendant United Bank—held legal title to the UBC stock allocated to the individual Plan accounts of Plaintiffs and the Class. Section 2 of the Trust Agreement provided that United Bank had the power "to join in or oppose… liquidations" of Company Stock. Based on these provisions and the Payment

Policy's statement that "the Company" could effect the conversion of Company Stock held by terminated UBC employees, both UBC and United Bank caused the conversion of Company Stock held by terminated UBC employees to cash.

137.    As a result, Defendants UBC and UCB caused the Plan to engage in a prohibited transaction in violation of ERISA § 406(a)(1)(A) and (D), 29 U.S.C. § 1106(a)(1)(A) and (D).

138.    In exchanging its own cash and using cash held in the Plan accounts of active participants—the latter, assets of the Plan—and exchanging them for stock held in the Plan accounts of Plaintiffs and the Class, Defendant UBC dealt with the assets of the Plan in its own interest or for its own account in violation of in violation of ERISA § 406(b)(2).

**COUNT II**
**Breach of Fiduciary Duty Under ERISA §§ 404(a)(1)(A), (B) & (D),**
**29 U.S.C. §§ 1104(a)(1)(A), (B) & (D), Against United Bank and the Committee Defendants**
**on behalf of the Class**

139.    Plaintiffs incorporate and re-allege by reference each of the foregoing paragraphs as if fully set forth herein.

140.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries, (A) for the exclusive purpose of providing benefits to participants and the beneficiaries of the plan, (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (D) to act in accordance with the documents and instruments governing the plan insofar as those documents and instruments are consistent with ERISA.

141.    In the context of transactions involving the assets of the Plan, the duties of loyalty under ERISA § 404(a)(1)(A) and prudence under ERISA § 404(a)(1)(B) require a fiduciary to

undertake an appropriate investigation to determine that the plan and its participants receives adequate consideration for the plan's assets and the participants' account in the plan.

142.    Section 2.6 of the Trust Agreement provides that the Trustee has powers including "to "determine the fair market value of the Company Stock and other assets of the Trust Fund as of each Valuation Date."

143.    Section 13.4 of the December 2021 Plan Document (and the January 2018 Plan Document) states under a section entitled "Duties of the Administrator" that "The Fair Market Value of shares of Company Stock shall be determined as of each Valuation Date."

144.    Accordingly, both the Trustee and the Committee were responsible for determining the Fair Market Value of Company Stock as of each Valuation Date.

145.    In the context of transactions involving the assets of the Plan, the duties of loyalty under ERISA § 404(a)(1)(A) and prudence under ERISA § 404(a)(1)(B) require a fiduciary to undertake an appropriate investigation to determine that the plan and its participants receives adequate consideration for the plan's assets and the participants' account in the plan.

146.    Under ERISA § 3(18), adequate consideration means (A) in the case of a security for which there is a generally recognized market, either (i) the price of the security prevailing on a national securities exchange which is registered under section 78f of title 15, or (ii) if the security is not traded on such a national securities exchange, a price not less favorable to the plan than the offering price for the security as established by the current bid and asked prices quoted by persons independent of the issuer and of any party in interest; and (B) in the case of an asset other than a security for which there is a generally recognized market, the fair market value of the asset as determined in good faith by the trustee or named fiduciary pursuant to the terms of the plan and in accordance with the Department of Labor regulations.

147.    To fulfill those fiduciary duties, the Trustee, United Bank, and the Plan Administrator, the Committee, were required to undertake an appropriate and independent investigation of the fair market value of the assets of the Plan to fulfill their fiduciary duties. Among other things, the Trustee and Plan Administrator were required to conduct a thorough and independent review of any "independent appraisal," to make certain that reliance on any valuation experts' advice was reasonably justified under the circumstances of the purchase, to make an honest, objective effort to read and understand the valuation reports and opinions and question the methods and assumptions that did not make sense.

148.    Had the Trustee and Plan Administrator conducted an appropriately prudent and loyal investigation, that investigation would have revealed that the valuation used for, and the price paid to convert the UBC stock of Plaintiffs and the Class to cash did not reflect the fair market value of the stock and the purchases of the stock at those prices were not in the best interests of the Plan participants.

149.    This included because, for the reasons discussed above, the appraisals prepared for UBC stock failed to adjust the discount for lack of marketability to reflect that the Plan would imminently realize a substantial dividend as a result of the revocation of UBC's subchapter S election. Had the appraiser accordingly reduced the discount for lack of marketability, the price at which Plaintiffs' UBC stock was converted to cash would have been higher and the former employee participants would have received a higher price for their UBC shares.

150.    These breaches were not only imprudent but disloyal, including because suppressing the price paid for the UBC stock of Plaintiffs and the Class reduced the amount of cash UBC, United Bank's parent company, would be required to pay to effect the conversion.

**COUNT III**
**Breach of Fiduciary Duty Under ERISA §§ 404(a)(1)(A), (B) & (D),**
**29 U.S.C. §§ 1104(a)(1)(A), (B) & (D), Against United Bank, United Bank Corporation, and**
**the Committee Defendants on behalf of the Class**

151.    Plaintiffs incorporate and re-allege by reference each of the foregoing paragraphs as if fully set forth herein.

152.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries, (A) for the exclusive purpose of providing benefits to participants and the beneficiaries of the plan, (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (D) to act in accordance with the documents and instruments governing the plan insofar as those documents and instruments are consistent with ERISA.

153.    The Payment Policy was not validly adopted at the time Plaintiffs' UBC stock was converted to cash. Section 2 of the Payment Policy states that it was adopted by the Plan Administrator. But under Section 18 of the January 2018 Plan Document (and consistent with prior written instruments of the Plan), only UBC had the power to amend the Plan.

154.    And the terms of the Payment Policy expressly provided at Section 9 that it was "not intended to contravene any provision of the Plan document and to the extent it does so, the terms of the Plan document will control." But the adoption, implementation, and application of the Payment Policy against Plaintiffs and the Class violated the terms of the January 2018 Plan Document that permitted them to continue to hold UBC stock in their Plan accounts after termination.

155.     The December 2021 Plan Document purported to permit the adoption of the Payment Policy. But the December 2021 Plan Document was not adopted until December 15, 2021, *after* the Committee adopted the Payment policy and after UBC and United Bank had already caused the conversion of Plaintiffs' UBC stock to cash.

156.     By adopting the Payment Policy in contravention of the terms of the Plan, the Committee Defendants breached their fiduciary duties under ERISA § 404(a)(1)(A), (B), and (D), 29 U.S.C. § 1104(a)(1)(A), (B), and (D).

157.     By implementing the terms of the Payment Policy in contravention of the terms of the Plan, UBC and United Bank, as Trustee, breached their fiduciary duties under ERISA § 404(a)(1)(A), (B), and (D), 29 U.S.C. § 1104(a)(1)(A), (B), and (D) to act in accordance with the terms of the Plan.

## COUNT IV
### Invalidation of the Payment Policy, Enforcement of the Terms of the Plan, and Other Relief Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), against United Bank, UBC, and the Committee Defendants on behalf of the Class

158.     Plaintiffs incorporate and re-allege by reference each of the foregoing paragraphs as if fully set forth herein.

159.     28 U.S.C. § 2201(a) provides that "any court of the United States, upon the filing of an appropriate may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

160.     ERISA § 502(a)(3), 29 U.S.C. § 1102(a)(3), authorizes a plan participant to bring a civil action (A) to enjoin any act or practice which violates any provision of ERISA or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress violations of ERISA or the terms of the plan or (ii) to enforce any provisions of ERISA or the terms of the plan.

161.    Relief is unavailable under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) or the remedy under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) is inadequate because the terms of the Plan, as reflected in the December 2021 Plan Document, now include the terms of the purported amendment to the Plan effected by the Payment Policy. Therefore, a claim challenging the validity of the amendment is properly brought under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

162.    As a matter of federal common law, which applies to ERISA plans, the terms of the Plan are fixed at the time of acceptance by the employee participant. The terms of a pension plan at the time that an employee completes substantial performance are the terms that govern the benefits owed to and to be paid to the participant.

163.    Section 18.1 of the April 2011 Plan Document and the November 2016 Plan Document identically provided "No amendment may retroactively change or deprive Members [i.e. participants] or Beneficiaries of rights already accrued under the Plan." Section 18.1 of the January 2018 Plan Document similarly provided: "No such modifications or amendments shall have the effect of retroactively changing or depriving Participants or Beneficiaries of rights already accrued under the Plan."

164.    Based on those terms, as a matter of federal common law, the Payment Policy and the December 2021 Plan Document are invalid to the extent they apply to participants of the ESOP who completed substantial performance before their effective dates.

165.    Plaintiff Davis's years of service prior to her termination in 2015 constituted substantial performance.

166.    Plaintiff Ogletree's years of service prior to her termination in 2016 constituted substantial performance.

167.    As a result of being former employees who had vested under the terms of the Plan by the time of their termination, each of the Class Members had also provided substantial performance before September 23, 2021.

168.    Effective September 23, 2021, the Committee adopted the Payment Policy that eliminated the ability of former employees to remain invested in employer stock through the Plan.

169.    Section 18.1 of each of the applicable Plan Documents (April 2011, November 2016 and January 2018) provided that only the Primary Plan Sponsor had the authority to amend the terms of the Plan. As such, a "Payment Policy" adopted only by the Committee was ineffective to amend the terms of the Plan.

170.    Effective December 15, 2021, UBC adopted the December 2021 Plan Document, which retroactively authorized the Payment Policy and incorporated restrictions on the rights of participants to effectively vindicate their rights under ERISA, including a binding arbitration provision, a contractual limitations period, and a waiver of class-wide and plan-wide relief.

171.    In adopting the Payment Policy, the Committee Defendants violated the terms of the applicable written instrument(s) of the Plan for Plaintiff and the Class, including those terms providing that only the Plan Sponsor could amend the Plan.

172.    In implementing the Payment Policy, United Bank and UBC violated the terms of the applicable written instrument(s) of the Plan for Plaintiff and the Class, including those terms providing that Plaintiffs and the Class could continue to hold UBC stock in their Plan Accounts and could not be made to take a distribution until their Normal Retirement Age.

173.    In purporting to apply the 2021 Plan Document its binding arbitration, class action waiver, venue restrictions, and limitations period to Plaintiffs and the Class, the

39

Committee Defendants violated the terms of the applicable written instrument(s) of the Plan for Plaintiffs and the Class.

## COUNT V
### Violation of the Anti-Cutback Provision of ERISA § 204(g), 29 U.S.C. § 1054(g) against UBC, United Bank, and the Committee Defendants on behalf of the Class

174.    Plaintiffs incorporate the preceding paragraphs as though set forth herein.

175.    ERISA § 204(g), 29 U.S.C. § 1054(g) provides that "the accrued benefit of a participant under a plan may not be decreased by an amendment of the plan." This section also provides that "a plan amendment which has the effect of… eliminating an optional form of benefit, with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits."

176.    An accrued benefit includes not only the "net effect" of the dollars earned or paid under the plan, but also the features and elements of the benefit formula itself. As a result, the accrued benefits protected from elimination by amendment under ERISA § 204(g) include the conditions on which the benefits are to be paid under the plan.

177.    IRS regulations explain that "optional forms of benefit" include "terms relating to the payment schedule, timing, commencement, medium of distribution (e.g., in cash or in kind), election rights, differences in eligibility requirements, or the portion of the benefit to which the distribution alternative applies." 26 C.F.R § 1.411(d).

178.    Under the terms of the plan before the adoption of the December 2021 Plan Document, a former employee participant had at least three different rights related to their UBC stock that were accrued benefits under the Plan: (a) a former employee was entitled to remain a participant in the Plan and continue to hold UBC stock in her Plan account until age 65; (b) former employee participants were entitled to take a distribution of their UBC stock in the form of stock; and (c) former employee participants had the right to require UBC to repurchase UBC

stock which had been distributed to them. The Payment Policy and December 2021 Plan Document eliminated each of these accrued benefits under the Plan for the Class.

179.    Section 9.4(a)(1) of the April 2011 Plan Document provided that "Notwithstanding any provision of the Plan to the contrary… if a Member's vested Accrued Benefit exceeds $5,000… it shall not, without the Member's consent, be distributed prior to the date the member attains his Normal retirement Age." Under the terms of the Plan applicable to Plaintiffs, their Normal Retirement Age was 65. Substantially similar provisions were included in the 2016 Plan Document, January 2018 Plan Document, and December 2021 Plan Document. This protection against involuntary distribution before age 65 was also an accrued benefit under the Plan.

180.    Plaintiffs and the Class received distributions of their Plan accounts in the form of cash in October 2021. But these were not consensual distributions. Under 26 C.F.R. § 1.411(a)–11(c), "consent is not valid if a significant detriment is imposed under the plan on any participant who does not consent to a distribution." The Payment Policy imposed a substantial detriment on any participant who did not consent to a cash distribution by requiring the forced divestment of their UBC stock and the reinvestment of the proceeds in the American Balanced Fund. Participants could not direct the investment of the cash proceeds of the conversion of their UBC stock. The American Balanced Fund had materially different risk and return characteristics from UBC stock.

181.    Forced liquidations of former employees' employer stock are sometimes termed "reshuffling" provisions. The IRS has provided guidance regarding such provisions, stating in a technical assistance memorandum dated February 23, 2010, that:

> such reshuffling provisions must also comply with section 1.411(a)-11(c)(2)(i) of the Regulations, which provides that consent to a distribution is not valid if the plan

imposes a significant detriment on a participant who does not consent to a distribution. In Revenue Ruling 96-47, terminated participants who did not elect a distribution lost the ability to choose from a range of investment options and were required to invest in a money market fund. The ruling concluded that the participants experienced a significant detriment under 1.411(a)-11(c)(2)(i). Accordingly, a plan providing participants with the option of an immediate distribution would need to have language that preserves sufficient investment options in order to ensure that the loss of the employer stock investment is not a "substantial detriment." For example, the plan might offer three alternative investment options such as described in Code section 401(a)(28)(B) or might offer other choices that include a life-cycle fund or targeted-retirement-date fund.

182.    The Committee Defendants failed to comply with IRS guidance when they issued the Payment Policy. Participants were not provided with sufficient investment options in order to ensure that the loss of the employer stock investment was not a substantial detriment. In fact, participants were provided with no investment options at all: if they stayed in the Plan, their account would be invested in the American Balanced Fund. The Payment Policy thus caused Plaintiffs and the Class to take nonconsensual distributions and deprived them of the accrued benefit of not being subject to the involuntary distribution of their account balance before age 65.

183.    As a result, the Payment Policy, December 2021 Plan Document, and the involuntary liquidations of the UBC stock held by Plaintiffs and members of the Class constituted a prohibited cut-back of benefits in violation of ERISA § 204(g).

## COUNT VI
**Breach of Fiduciary Duty Under ERISA §§ 404(a)(1)(A), (B) & (D), 29 U.S.C. §§ 1104(a)(1)(A), (B) & (D) Against UBC and the Board Defendants on Behalf of the Class for Failure to Monitor the Trustee & the Committee Defendants**

184.    Plaintiffs incorporate the preceding paragraphs as though set forth herein.

185.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires that a plan fiduciary discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries, (A) for the exclusive purpose of providing benefits to participants and the beneficiaries of the plan, (B) with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with ERISA.

186.    Under ERISA § 404(a)(1)(A) and (B), a fiduciary with the authority to appoint or remove other fiduciaries has an obligation to undertake an appropriate investigation that the fiduciary is qualified to serve in the position as fiduciary and at reasonable intervals to ensure that the appointed fiduciary remains qualified to act as fiduciary and is acting in compliance with the terms of the Plan and in accordance with ERISA.

187.    Under Section 13.2 of the December 2021 Plan Document (and the January 2018 Plan Document), UBC has the authority to appoint and remove the Plan Administrator.

188.    Under Section 13.1 of the December 2021 Plan Document (and the January 2018 Plan Document), UBC has the authority to appoint and remove the Trustee of the ESOP.

189.    Section 13.7 of the December 2021 Plan Document (and the January 2018 Plan Document) provides that "Any action to be taken by a Plan Sponsor shall be taken by resolution or written direction duly adopted by its board of directors or appropriate governing body, as the case may be…." It was the Board of Directors that thus in fact exercised UBC's authority to appoint and remove the Plan Administrator and the Trustee of the ESOP from at least September 2021 through the present.

190.    UBC and the Board Defendants knew or in the exercise of reasonable diligence, should have known about all the above breaches and violations by the Trustee and Committee Defendants (including because UBC itself acted in the October 2021 liquidations of the UBC stock of Plaintiffs and the Class) but took no appropriate corrective action.

191.    Had UBC and the Board Defendants properly monitored the Trustee and Committee Defendants, they should have done one or more of the following: (a) promptly removed and replaced the Trustee and the Committee or its members as fiduciaries; (b) appointed an independent fiduciary; or (c) taken actions necessary to remedy any fiduciary breaches including as necessary, to remedy the underpayment for or improper liquidation of UBC stock; or (d) a combination of the foregoing.

192.    By failing to properly monitor the Trustee and the Committee or failing to take appropriate action upon learning of information that the Trustee and the Committee had breached its duties, UBC and the Board Defendants breached their fiduciary duties under ERISA § 404(a)(1)(A), (B) and (D), 29 U.S.C. § 1104(a)(1)(A), (B) and (D).

**COUNT VII**
**Co-Fiduciary Liability Pursuant to ERISA § 405, 29 U.S.C. § 1105**
**Against All Defendants on behalf of the Class**

193.    Plaintiffs incorporate the preceding paragraphs as though fully set forth herein.

194.    ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach when (1) "he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission of such other fiduciary is a breach;" (2) "by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach;" or (3) "he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

195.    UBC and the Board Defendants failed to comply with section 404(a)(1) in the administration of their responsibilities as fiduciaries responsible for the appointment of the Trustee and Plan Administrator, as set forth above. In doing so, they enabled United Bank and

the Committee Defendants to commit their breaches as set forth in Counts I, II, III, and V and are liable for them under ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2).

196.    The Committee Defendants failed to comply with section 404(a)(1) in the administration of their responsibilities as fiduciaries including because as set forth in Count III above they adopted the Payment Policy contrary to the terms of the Plan. In doing so, they enabled UBC and United Bank to commit their breaches as set forth in Counts I, II, III, and V are are liable for them under ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2).

197.    Section 2.6 of the Trust Agreement provides that the Trustee has powers including "to begin, maintain, or defend any litigation necessary in connection with the investment, reinvestment, and holding of the assets of the Trust Fund and the administration of the Trust," and "to join in or oppose… liquidations."

198.    As a fiduciary of the ESOP with the power to oppose liquidations, United Bank had the power to stop UBC from liquidating the UBC stock held by Plaintiffs and members of the Class. In failing to do so United Bank enabled UBC to commit the breaches set forth in Counts I, II and V and is liable for them under ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2).

199.    As a fiduciary of the ESOP with the powers to bring actions on behalf of the Plan, the Trustee had the ability to bring actions on behalf of the Plan pursuant to ERISA § 502(a)(2) and ERISA § 502(a)(3).

200.    Among the assets of an employee benefit plan under ERISA is a "chose in action" – the right to bring an action to recover a debt, money or a thing – including to institute a lawsuit for a breach of fiduciary duties or other violations. As a result, the assets of the Plan included against UBC and the Committee Defendants as set forth in Count I, Count II, Count III, and

Count V.  By virtue of the power pursuant to the Plan, the Trustee had the authority to institute the claims set forth in Counts I, II, III, and V on behalf of the Plan.

201.    United Bank never took any action, including any legal action, or exercised any other authority under the Plan Document or the Trust Agreement, to properly manage this chose in action. In doing so, United Bank enabled UBC and the Committee Defendants to commit their breaches as set forth in Counts I, II, III, and V and is liable for them under ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2).

202.    United Bank knew all the relevant facts regarding the breaches of UBC and the Committee Defendants set forth in Counts I, II, III, and V, including because it was itself a participant in the process of setting a price for and liquidating the shares of former employee participants. United Bank never took any action, including any legal action, or exercised any other authority under the Plan Document or the Trust Agreement to remedy those breaches and is thus liable for them ERISA § 405(c), 29 U.S.C. § 1105(c).

## COUNT VIII
**For Declaratory Judgment Pursuant to 28 U.S.C. § 2201 and Other Equitable Relief Pursuant to ERISA § 502(a)(3) Against All Defendants on Behalf of the Class to Declare Invalid and Enjoin Enforcement of Section 21 of the December 2018 Plan Document**

203.    Plaintiffs incorporate the preceding paragraphs as though set forth herein.

204.    The December 2021 Plan Document adopted a binding arbitration provision at Section 21.

205.    In addition to requiring binding arbitration of any claim concerning the Plan or the Trust, Section 21.1(b) of the December 2021 Plan Document includes a "No Group, Class, or Representative Arbitrations" which provides "All Covered Claims must be brought solely in the Claimant's individual capacity and not in a representative capacity or on a class, collective, or group basis. Each arbitration shall be limited solely to one Claimant's Covered Claims, and that

Claimant may not seek or receive any remedy which has the purpose or effect of providing additional benefits or monetary or other relief to any person, including without limitation, any Eligible Employee, Participant or Beneficiary other than the Claimant."

206.    Section 21.1(e) of the December 2021 Plan Document includes a "Limitation on Actions" providing that Any Covered Claim must be submitted to arbitration within the earlier of the applicable statutory period of limitations or three (3) years following the date on which the Covered Claim accrued or it shall be barred as untimely."

207.    Section 21.1(m) of the December 2021 Plan Document includes a "Restriction on Venue" provision requiring any action challenging the legal enforceability of the arbitration procedure to be filed in the Southern District of Georgia.

208.    9 U.S.C. § 2 provides that: "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract…." *Id.*

209.    Section 21 of the December 2021 Plan Document—including the binding arbitration procedure, "No Group, Class, or Representative Arbitration" provision, "Limitation on Actions" provision, and "Restriction on Venue" provision—is unenforceable against Plaintiffs and the Class because Plaintiffs and the Class never assented to the December 2021 Plan Document. Indeed, by the time the December 2021 Plan Document was unilaterally and retroactively adopted by UBC, Plaintiffs and all members of the Class had taken distributions and no longer had accounts in the Plan. Neither Plaintiff signed any writing or further performed

in their employment in a manner that would indicate their assent to it. "Where the party seeking to avoid arbitration admittedly did not sign any contract requiring arbitration… there is no presumptively valid general contract which would trigger the district court's duty to compel arbitration pursuant to the [FAA]." *Bess v. Check Express*, 294 F.3d 1298, 1305 (11th Cir. 2002).

210.    Plaintiffs and members of the Class never even received notice of the adoption of the December 2021 Plan Document or of the binding arbitration provision.

211.    Additionally, adoption of Section 21 of the December 2021 Plan Document constitutes an amendment that has effect of retroactively changing or depriving Class Members of rights already accrued under the Plan.

212.    Section 21 of the December 2021 Plan Document is unenforceable against those who (1) terminated employment with UBC prior to the adoption of the 2021 Plan Document or (2) had the balance of their accounts liquidated before the adoption of the 2021 Plan Document or (3) did not receive a copy of the 2021 SPD disclosing this provision, including Plaintiffs and members of the Class.

213.    Section 21 of the December 2021 Plan Document is also unenforceable against Plaintiffs and the Class because its "No Group, Class, or Representative Arbitration" provision prospectively waives the statutory remedies of participants.

214.    ERISA § 502, 29 U.S.C. § 1132(a)(2) provides participants and their beneficiaries with the right to bring claims not just on behalf of themselves but to obtain relief for the Plan, pursuant to ERISA § 409(a). In purporting to waive that right, Section 21 inhibits the effective vindication of Plaintiffs' statutory rights. Every Circuit to address this issue to date has invalidated similar arbitration provisions: *Cedeno v. Sasson*, 100 F.4th 386, 395 (2d Cir. 2024) (holding similar plan language requiring ERISA plaintiffs to bring claims in an individual and

not representative capacity forbade the assertion of statutory rights under ERISA and was thus unenforceable); *Parker v. Tenneco, Inc.*, No. 23-1857, 2024 WL 3873409, at *11 (6th Cir. Aug. 20, 2024) (same); *Harrison v. Envision Mgmt. Holding, Inc. Bd. of Directors*, 59 F.4th 1090, 1109 (10th Cir. 2023) (same); *Henry on behalf of BSC Ventures Holdings, Inc. Emp. Stock Ownership Plan v. Wilmington Tr. NA*, 72 F.4th 499, 507 (3d Cir. 2023) (same); *Smith v. Bd. of Dirs. of Triad Mfg., Inc.*, 13 F.4th 613, 620–23 (7th Cir. 2021) (same).

215.    The "No Group, Class, or Representative Arbitration" provision states that it "is a material and non-severable term of this Section 21" and that in "the event a court were to find these requirements to be unenforceable or invalid, then the entire Arbitration Procedure (i.e., all of this Section 21) shall be rendered null and void in all respects as to the particular claim that is the subject of the court's ruling."

216.    Defendant Eavenson, acting on behalf of the Committee as Plan Administrator, has stated to both Plaintiffs in writing that the Committee intends to apply the arbitration provisions, including the "No Group, Class, or Representative Arbitration" provision, to Plaintiffs. Based on the statement by the Plan Administrator, the Plan Administrator intends to apply that provision to the Class Members as well.

217.    A declaration that Section 21 of the 2021 Plan Document is unenforceable against Plaintiffs and members of the Class and a permanent injunction preventing Defendants from enforcing Section 21 of the 2021 Plan Document against Plaintiffs and members of the Class is thus appropriate.

**COUNT IX**
**Violation of ERISA § 102(a), 29 U.S.C. § 1102(a)**
**Against the Committee Defendants on behalf of the Class**

218.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

219.    ERISA § 102, 29 U.S.C. § 1102 provides that "A summary plan description of any employee benefit plan shall be furnished to participants and beneficiaries as provided in section 1024(b) of this title. The summary plan description shall include the information described in subsection (b), shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan."

220.    The Plan Administrator of the ESOP issued a Summary Plan Description dated January 1, 2022 (the "2022 SPD").

221.    The 2022 SPD stated that "If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court."

222.    This statement is false. Section 21 of the December 2021 Plan Document purports to require all actions challenging the denial of a claim for benefits to be submitted to binding arbitration.

223.    And contradicting its own statement, the 2021 SPD also states that any all claims must be resolved by binding arbitration.

224.    Given the contradiction between the 2021 Plan Document and the 2022 SPD as well as the internal contradiction in the 2022 SPD, the 2022 SPD fails to reasonably apprise participants and beneficiaries of their rights and obligations under the plan and is not written in a manner calculated to be understood by the average plan participant, in violation of ERISA § 102(a).

**COUNT X**
**Failure to Provide Documents Upon Request Pursuant to ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4) & ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A)**
**Against the Committee Defendants on behalf of Plaintiffs individually**

225.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

226.     ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4), provides that the administrator of an employee benefit plan "shall, upon written request of any participant or beneficiary, furnish a copy of certain enumerated documents as well as "other instruments under which the plan is established or operated" to the requesting participant or beneficiary within 30 days of the Request.

227.     As part of their administrative claims dated February 22, 2024, and March 19, 2024, both Plaintiffs Davis and Ogletree respectively requested that the Plan Administrator provide them with the report/analysis by the Independent Appraiser demonstrating that "the price for my (and other former employees') shares was fair market value."

228.     The Committee refused. Defendant Eavenson wrote on behalf of the Plan Administrator that "The valuation report prepared by the independent third party appraiser for the ESOP Trustee is not within the scope of materials required to be provided to participants and beneficiaries pursuant to Section 104(b); therefore we have not included a copy of the valuation report with this letter."

229.     But the valuation report or whatever document(s) were used to set the price for the conversion of Plaintiffs stock is an instrument under which the plan is established or operated. *Truong v. KPC Healthcare, Inc.*, No. 8:23-CV-01384-SB-BFM, 2024 WL 1984569, at *8 (C.D. Cal. May 3, 2024) (denying motion to dismiss ERISA § 104(b) claim seeking ESOP valuation report); *Werner v. Morgan Equip. Co.*, 1992 WL 453355 (N.D. Cal. 1992) (stock valuation report is an instrument under which a plan is established or operated when the plan measures benefits by the value of stock); *see Hughes Salaried Retirees Action Comm. v. Adm'r of Hughes Non-Bargaining Ret. Plan*, 72 F.3d 686, 690 (9th Cir. 1995) (citing valuation reports as example of such instruments).

230.     More than 30 days have passed since Plaintiffs' written requests dated February 22, 2024, and March 19, 2024, and the Plan Administrator has still not produced to Plaintiffs the valuation report that was used to determine the fair market value of their UBC shares in connection with the 2021 conversion of their UBC stock to cash.

231.     Pursuant to ERISA § 502(c), 29 U.S.C. § 1132(c), and 29 C.F.R. § 2575.502c-1, the failure to produce the requested documents within 30 days of Plaintiff's request exposes the Plan's administrator to statutory penalties in an amount not exceeding $110 per day for each day that the request remains unfulfilled beyond the 30-day deadline.

232.     Pursuant to ERISA § 502(a)(1)(A), 29 U.S.C. § 1132(a)(1)(A), a participant may bring a civil action to obtain the relief authorized by 29 U.S.C. § 1132(c) and 29 C.F.R. § 2575.502c-1.  Pursuant to ERISA § 502(c), 29 U.S.C. § 1132(c), "[a]ny administrator . . . who fails or refuses to comply with a request for any information which such administrator is required by [ERISA] to furnish" by mailing the requested material to "the requesting participant . . . within 30 days after such request" may be liable for up to $110 per day in civil penalties.

233.     By breaching their fiduciary duties to Plaintiffs pursuant to ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), the ESOP Committee Defendants should be liable via surcharge to the equivalent of the penalty under ERISA § 502(c).

**ENTITLEMENT TO RELIEF**

234.     By virtue of the violations set forth in the foregoing paragraphs, Plaintiffs and the Class are entitled to sue each of the Defendants pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), for relief on behalf of the Plan as provided in ERISA § 409, 29 U.S.C. § 1109, including for recovery of any losses to the Plan, the recovery of any profits resulting from the

breaches of fiduciary duty, and such other equitable or remedial relief as the Court may deem appropriate.

235.    By virtue of the violations set forth in the foregoing paragraphs, Plaintiffs and the Class are entitled pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), to sue each of the Defendants for any appropriate equitable relief to redress the wrongs described above.

## PRAYER FOR RELIEF

Wherefore Plaintiffs, on behalf of themselves and the Class, pray that judgment be entered against Defendants on all claims, and request that the Court order or award the following relief:

A.    Declare any transaction that constitutes a prohibited transaction void and (1) require any fiduciary or party-in-interest engaging in these transactions to disgorge any profits made as a result of such transaction; (2) declare a constructive trust over the proceeds of any such transaction; or (3) order any other appropriate equitable relief;

B.    Declare that each of the Defendants have breached their fiduciary duties to the Plan and the Class, are liable under ERISA § 405, or knowingly participated in other fiduciaries' breaches of fiduciary duty;

C.    Order that the Defendants found to have breached their fiduciary duties to the Plan to jointly and severally make good to the Plan or to any successor trust(s) the losses resulting from their breaches and restore any profits they have made through use of assets of the Plan;

D.    Order that the Defendants provide other appropriate equitable relief to the Plan, Plaintiff, and the Class, including but not limited to, surcharge, an accounting for profits, imposing a constructive trust or equitable lien on any funds wrongfully held by any of

Defendants, or other traditional equitable remedies that will make the Plaintiff and the Class whole;

E.      Order that Plaintiffs and the members of the Class be reinstated in the Plan as of October 2021 and that the terms of the written instrument of the Plan be reformed to eliminate the applicability of the December 2021 Plan document as to Plaintiff and members of the Class;

F.      Order the proceeds of any recovery for the Plan to be allocated to the accounts of the Class to make them whole for any injury that they suffered because of the breaches of fiduciary duty in accordance with the Court's declaration with respect to the terms of the Plan;

G.      Order pursuant to ERISA § 206(d)(4) that any amount to be paid to or necessary to restore losses to the account of Plaintiffs and the Class can be satisfied by using or transferring any breaching fiduciary's account in the Plan to the extent of his liability;

H.      Order the removal of Defendants from their positions as fiduciaries of the ESOP;

I.      Appoint an Independent Fiduciary to manage the ESOP to be paid for by Defendants;

J.      Order the Plan Administrator to provide an updated Summary Plan Description that complies with ERISA § 102, 29 U.S.C. § 1022;

K.      Award Plaintiffs the statutory amount of $110 per day, per violation, for the failure to provide each of the requested documents that the Plan Administrator failed to provide and as necessary require the Committee Defendants pay that amount via surcharge;

L.      Declare that Section 21 of the December 2021 Plan Document is unenforceable against Plaintiffs and the Class and permanently enjoin Defendants from enforcing it against Plaintiffs and the Class.

M.      Declare that any indemnification agreement between any of the Defendants and

the Plan violates ERISA § 410, 29 U.S.C. § 1110, and is therefore null and void;

N.    Require Defendants to pay attorney's fees and the costs of this action pursuant to ERISA §502(g)(1), 29 U.S.C. § 1132(g)(1) or ordering the payment of reasonable fees and expenses of this action to Plaintiff's counsel on the basis of the common benefit or common fund doctrine (or other applicable law) out of any money or benefit recovered for the Class or Subclass here;

O.    Order Defendants to pay prejudgment interest and post-judgment interest; and

P.    Award any such other relief that the Court determines that Plaintiffs, the Class and the Subclass are entitled pursuant to ERISA §502(a), 29 U.S.C. § 1132(a) and pursuant to Rule 54(c) of the Federal Rules of Civil Procedure.

Dated:  September 23, 2024                    Respectfully submitted,

*/s/ J. Cameron Tribble*
Roy E. Barnes
Georgia Bar No. 039000
J. Cameron Tribble
Georgia Bar No. 754759
**BARNES LAW GROUP, LLC**
31 Atlanta Street
Marietta, GA 30060
Telephone: (770) 227-6375
Fax: (770) 227-6373
Email: roy@barneslawgroup.com
Email: ctribble@barneslawgroup.com

R. Joseph Barton (application for admission *pro hac vice* to be filed)
**BARTON & DOWNES LLP**
1633 Connecticut Ave. NW., Ste. 200
Washington, DC 20009
Tel: 202-734-7046
Email: jbarton@bartondownes.com

*Attorneys for Plaintiffs*